IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2018

## LYMUS LEVAR BROWN, III v. STATE OF TENNESSEE

Appeal from the Circuit Court for Haywood County
No. 6710     Clayburn L. Peeples, Judge

_____

### No. W2017-01726-CCA-R3-PC
_____

A Haywood County jury convicted the Petitioner, Lymus Brown, of aggravated robbery, and the trial court sentenced him to thirty years in prison. *State v. Lymus Brown*, No. W2012-02298-CCA-R3-CD, 2013 WL 12181029, at *1 (Tenn. Crim. App., at Jackson, Nov. 26, 2013), *perm. app. denied* (Tenn. Apr. 8, 2014). This court affirmed his conviction on appeal. The Petitioner filed a petition for post-conviction relief in which he alleged that his trial counsel was ineffective in failing to interview a witness, failing to adequately cross-examine another witness, failing to allow him to testify, and failing to have the jury instructed on facilitation. The post-conviction court denied relief. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

William J. Milam, Jackson, Tennessee, for the appellant, Lymus Levar Brown, III.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; Garry G. Brown, District Attorney General; and Hillary L. Parham, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts
### A. Trial

This case arises from the Petitioner robbing a Cash Express in January 2011. For this offense, a Haywood County grand jury indicted him for aggravated robbery. In our opinion affirming the Petitioner's convictions, we summarized the facts presented at trial as follows:

At trial, Terica Gause testified that she was working at Cash Express on January 18, 2011. Tamika Anderson was also working that day, but Ms. Anderson left the store to purchase supplies prior to the robbery. Ms. Gause said that the store normally opened at 9:30 a.m., but that day, a tall, black man entered the store between 9:00 and 9:30 a.m. He was wearing a black or blue jacket with white stripes and a black or blue ball cap. When shown a picture of [the Petitioner] wearing a jacket, she testified that the jacket [the Petitioner] was wearing "kind of look[ed] like" the one worn by the robber. Ms. Gause testified that the man asked whether the store cashed checks. When she responded affirmatively, the man pulled a gun and a black bag from his jacket, laid the gun on the counter, and told her to give him all of the money. Ms. Gause recalled that she was crying and terrified, but the man told her that he would not hurt her. She said that she pulled the cash drawer out to give him the money. Ms. Gause stated that she believed there was $525 in the drawer, plus change. She hit the store's panic button at some point during the robbery, and after the man left, she locked the door. At that point, she answered the store's telephone. The store's main office had accessed the store's security footage when Ms. Gause had pressed the panic button, and they were calling to verify her safety. The main office had also contacted the police. Ms. Gause testified that the man had left a cellular telephone on the floor of the store. She said that she and Ms. Anderson had closed the store the previous night, and they had vacuumed the floors at that time. There was not a cellular telephone on the floor the night before, and no one else had entered the store besides her, Ms. Anderson, and the robber.

On cross-examination, she agreed that she had previously said that the robber was taller than she was. She agreed that she was five feet, four inches tall and that the robber was between five feet, six inches and five feet, eight inches tall. She further agreed that she never identified [the Petitioner] in a lineup.

Tamika Anderson, the store manager of the Cash Express, testified that she was not at the store during the January 18, 2011 robbery. She explained that she left the store to purchase supplies, and she took $25 from the cash drawer with her. Ms. Anderson testified that there would have been $515 in the drawer at that point. She recalled seeing a man standing outside the Cash Express, whom she described as a black male wearing a blue or black jacket with white lettering that was trimmed in royal blue and a dark navy or black baseball cap. When shown a photograph of [the Petitioner] wearing a jacket and cap, she said that the jacket and cap looked

2

similar to those worn by the man outside of the store on the day of the robbery. Ms. Anderson said that there was not a telephone on the store's floor the night before or the morning of the robbery.

Brownsville Police Investigator Patrick Black testified that he investigated the robbery at the Cash Express store. He arrived at the store within two minutes of receiving the call about the robbery. Ms. Gause informed him that the robber had left a cellular telephone on the floor, and he took the telephone into evidence. Investigator Black testified that he obtained a search warrant for the telephone and had the telephone sent to the Tennessee Bureau of Investigation ("TBI") laboratory for "serology and fingerprint identification." Pursuant to the search warrant, Investigator Black downloaded photographs from the telephone, which were entered into evidence. He distributed the photographs to various agencies in West Tennessee and throughout the patrol division in an attempt to identify the person in the photographs, and this attempt was successful. Investigator Black also obtained the number associated with the telephone: 731-879-0475. Investigator Black testified that information he received from the TBI laboratory led him to obtain a search warrant for [the Petitioner's] DNA. The search warrant was executed, and DNA swabs from [the Petitioner] were sent to the TBI for testing.

Investigator Black testified that he arrested [the Petitioner] at the Bureau of Probation and Parole in Jackson, Tennessee. [The Petitioner] told Investigator Black that he had never been to Brownsville and did not have anything to do with the robbery. [The Petitioner] said that he had sold his telephone several weeks earlier for forty-five to fifty dollars to a person named James. When asked whether [the Petitioner] identified James to him, Investigator Black responded that [the Petitioner] had James's driver's license. [The Petitioner] did not indicate why he had James's driver's license. Investigator Black testified that Marquisha Lloyd was with [the Petitioner] when he was arrested. He further testified that photographs of Ms. Lloyd were found on the cellular telephone associated with the robbery. Investigator Black testified that [the Petitioner] said that "he had seen himself on the news and was waiting to come in to see his parole officer about it." Investigator Black said that the news footage was shown within a few days of the robbery and that [the Petitioner] was arrested thirteen days after the robbery. Investigator Black testified that [the Petitioner] indicated that he knew he was wanted by the police but did not turn himself in because he was scared.

3

On cross-examination, Investigator Black said that he believed the photograph released to the media was one taken from the telephone, not from Cash Express's surveillance video. He testified that TBI Agent Brent Booth and a Jackson Police Department officer followed up on the information from [the Petitioner] about James. They learned that the driver's license was stolen. Investigator Black agreed that Ms. Gause never positively identified anyone from the lineup he showed her and that he never found the jacket worn by [the Petitioner] in the photographs.

Probation and Parole Officer Evelyn Hill testified that [the Petitioner] had been under her supervision in January 2011. [The Petitioner] met with her at her office on January 11, 2011. As part of the normal procedure for meetings, he completed an information form that asked for his telephone number. The number he provided was 731-879-0475. Officer Hill testified that [the Petitioner] came to her office on January 31, 2011, "at [her] insistence." She said that [the Petitioner] had contacted her between January 11 and January 31 to tell her about a change to his address but not a change to his telephone number.

. . . .

TBI Agent Mark Dunlap of the serology and DNA unit testified that he tested the telephone for DNA. . . . He swabbed the telephone for DNA and developed a DNA profile that he entered into a database. From the information gathered from the database, Agent Dunlap requested a DNA sample from [the Petitioner]. Once he received that, he compared the DNA from the telephone with [the Petitioner's] DNA. Agent Dunlap testified that there were at least two people who contributed DNA to what was found on the phone. [The Petitioner] was the major contributor, and an unknown female was the minor contributor. On cross-examination, Agent Dunlap testified that there was no way to tell how long the DNA had been on the telephone.

Shanee Cohen testified that [the Petitioner] was her ex-boyfriend. They had dated from March to November 2010. Sometime after the robbery, [the Petitioner] called her. He told her that he had been involved in the robbery. [The Petitioner] also told her that one of the women working at the store and the woman's boyfriend were supposed to be involved. He never said anything about whether the woman's boyfriend actually participated in the robbery, but he said that the woman had gotten scared and left the store prior to the robbery.

4

On cross-examination, Ms. Cohen agreed that she had one prior conviction for theft. She also said that she called [the Petitioner's] cellular telephone after they had broken up and that someone other than [the Petitioner] answered the telephone.

Nimrod White testified that he had been incarcerated with [the Petitioner]. [The Petitioner] told him that he had been at the Cash Express during the robbery, but [the Petitioner] did not explicitly say that he had committed the robbery. [The Petitioner] told Mr. White that he had been standing outside and saw a woman leave the store and walk by him. He then went inside the store. [The Petitioner] indicated to Mr. White that he had a gun with him. [The Petitioner] also told Mr. White about a cellular telephone that was found at the store after the robbery. [The Petitioner] said that the only way the police could connect him to the telephone was through photographs and text messages sent to or received from a female friend of [the Petitioner] the day before the robbery because [the Petitioner] had told the police that he had sold the telephone. Mr. White testified that he believed the female friend's name was "Marquita or something like that" and that her last name was Lloyd. Mr. White agreed that he had a cellular telephone at the county jail and that [the Petitioner] had used his telephone to call Marquisha Lloyd at a number ending in 7704. On cross-examination, Mr. White agreed that he had several aggravated burglary, burglary, theft, and vandalism convictions.

The State recalled Investigator Black. He testified that the cellular telephone found at Cash Express had one contact number with the last digits 7704, which was assigned to the name "Budda Bay." There were several text messages from Budda Bay on January 17, 2011, the day before the robbery. Investigator Black also testified that there were photographs of Marquisha Lloyd on the telephone, and at least one photograph had been taken the day before the robbery.

On cross-examination, Investigator Black agreed that some of the photographs on the telephone appeared to have been taken during a time period in which [the Petitioner] was incarcerated. On re-direct examination, Investigator Black testified that the boots worn by [the Petitioner] in the courtroom were similar to those in a photograph from the telephone. Following this testimony, the State rested.

On behalf of [the Petitioner], Janice Webb, a nurse who provided

5

services at the Haywood County Criminal Justice Complex, testified that she had weighed [the Petitioner] and taken his height the morning of her testimony. [The Petitioner] was six feet, one inch tall and weighed 204 pounds.

The State called Investigator Black as a rebuttal witness. He testified that the description of the robber sent to law enforcement agencies after the robbery stated that the robber was five feet, eleven inches tall. Investigator Black testified that the robber's description came from the victim, Terica Gause.

*Brown*, 2013 WL 12181029, at *1-4. Following the close of proof and deliberations, the jury convicted the Petitioner as charged, and the trial court sentenced him as a Range III, persistent offender to serve thirty years in the Tennessee Department of Correction, with a release eligibility of 85%.

### B. Post-Conviction Facts

The Petitioner filed a petition for post-conviction relief in which he alleged his trial counsel was ineffective for: (1) failing to personally interview Mr. White before trial; (2) failing to adequately cross-examine Ms. Cohen; (3) failing to allow the Petitioner to testify; and (4) failing to have the jury instructed on facilitation. The parties presented the following evidence as relevant to the issues on appeal at a hearing on the post-conviction petition:

Nimrod White testified that he was incarcerated at the time of the post-conviction hearing. He and the Petitioner had been housed in an open pod together before the Petitioner's trial, and Mr. White had testified for the State at the trial. Mr. White recounted that his testimony entailed details that the Petitioner had given him about the robbery. Mr. White testified that, at the time of his testimony, he "believed" that he was truthful. After further reflection, however, Mr. White said he could not recall whether the Petitioner had told him those details or whether Mr. White had read them when he reviewed the Petitioner's discovery. Mr. White said he lied when he had been asked during the trial whether he had reviewed the Petitioner's discovery, and he responded that he had "never really looked at discovery myself." He agreed that, during the trial, he was asked this a second time and that he gave the same response. Mr. White said he could not say for certain whether his testimony was based on conversations he had with the Petitioner or on discovery. Mr. White said he regretted testifying in the Petitioner's case. He admitted that he helped the State with his testimony in hopes of helping himself.

During cross-examination, Mr. White testified that he testified at the trial, which

6

was almost five years before the post-conviction hearing. He said that, at the time of trial, he was testifying about his interactions with the Petitioner that had occurred two years before the trial. Mr. White believed that he read the transcript from the General Sessions hearing.

Mr. White said that he was currently incarcerated awaiting trial on an aggravated burglary charge and that he had approximately ten felony convictions.

During redirect examination, Mr. White reiterated that some of his trial testimony was false but that he did not intentionally lie under oath.

The Petitioner testified that he was currently incarcerated on aggravated robbery charges and serving a sentence of thirty years at 85%. He said that Counsel represented him, and the trial court declared a mistrial during his first trial, and he was convicted after his second trial. The Petitioner recalled that the State had offered him ten years, at 85%, in exchange for his guilty plea, and Counsel tried to "more or less coerce me into taking the plea agreement." The Petitioner said, however, that he was adamant that they take the case to trial.

The Petitioner testified that Counsel failed to properly cross-examine Mr. White. The Petitioner said that he let Mr. White review his discovery file. The Petitioner said that Mr. White had not testified during his first trial that ended in a mistrial but that the State produced him during the second trial. Mr. White testified during the second trial that the Petitioner admitted that he had committed the aggravated robbery at the Cash Express.

The Petitioner said that Counsel gave him a potential witness list two weeks before trial and that Mr. White's name was on the list. He said that Counsel never interviewed Mr. White and never moved to exclude Mr. White's testimony, despite the Petitioner's request that he do so. The Petitioner explained that Mr. White testified at another unrelated case that the Petitioner had pending but mixed up the facts of that case and the facts of this case. The Petitioner therefore asked Counsel to have Mr. White's testimony excluded because Mr. White had perjured himself. The Petitioner stated that he was never able to see Mr. White's statement before trial. The Petitioner said that, when he asked Counsel to interview Mr. White, Counsel responded "Why would I interview Nimrod White? What would he have to tell me[?]" and that was all Counsel said on that matter.

The Petitioner said that Shanee Cohen was his former girlfriend and that she also testified at his trial. Ms. Cohen said that the Petitioner had admitted to her that he had committed this robbery and that it was an "inside job" in that there were some other

7

individuals involved. The Petitioner alleged that Counsel did not properly cross-examine Ms. Cohen. He explained that Ms. Cohen, in her statement to police, said that she had given between five and six thousand dollars to the Petitioner around the time of the robbery. Counsel asked Ms. Cohen during cross-examination whether she had given the Petitioner money, and she responded affirmatively, but Counsel never asked her about the amount of money that she had given to the Petitioner. The Petitioner opined that Counsel should have asked about the amount of money because, he said, "why would I [have] had a need to commit a[n] aggravated robbery if I was being furnished with this (x) amount of dollars . . . ." He felt that this was information that the "jury needed to hear."

The Petitioner said that Ms. Cohen wrote him letters while he was incarcerated awaiting trial, and she stated in those letters that the reason that she told police he had committed the crime was because she had given the Petitioner a large sum of money and she felt that the Petitioner had taken her money and left. Ms. Cohen said in the letters that the State was "hunting her like a pack of wild dogs" to get her to testify. The Petitioner said that he gave the letters to Counsel and that Counsel failed to cross-examine Ms. Cohen about the letters. The Petitioner expressed frustration that Ms. Cohen was not present for the post-conviction hearing.

The Petitioner said he wanted to testify in his own defense at trial but that Counsel was "adamant" that he not testify. Counsel informed the Petitioner that he could be impeached with his prior convictions. He said that the trial court did not conduct a *Momon* hearing. The Petitioner said that, had there been a *Momon* hearing, he would not have waived his right to testify, despite his prior convictions.

The Petitioner said that, had he testified, he would have proven that there was no possibility that he was the culprit. He said he would have offered the letters from Ms. Cohen, and he would have said that Mr. White was a hostile witness.

The Petitioner said that Counsel was ineffective for "failing to require that the Court instruct on facilitation as a lesser included instruction to aggravated . . . robbery." The Petitioner said that there was a colloquy between Counsel and the trial court during which the trial court denied the request for the lesser-included instruction. The Petitioner said that his statements to other witnesses that came in during the trial, which included that there may have been other people involved, was sufficient evidence to warrant this instruction. He asserted that, had this instruction been given, he would have been convicted of a lesser charge and sentenced to only fifteen years at 35%.

During cross-examination, the Petitioner agreed that Counsel had requested a facilitation instruction and that the trial court denied this request. The Petitioner agreed that a cell phone with his DNA was found at the scene of the robbery. The Petitioner said

8

that Mr. White should have been disqualified as a witness because his testimony was untruthful and he was a hostile witness.

The Petitioner said that, had he testified, he would have said that he had not committed this armed robbery. He agreed that he had previously committed four other armed robberies and one attempted robbery. He had also been convicted of grand theft auto in Florida and possession of a Schedule II narcotic with intent to sell.

Counsel testified[1] that he had been a practicing attorney since 1997 and that he had represented multiple criminal defendants and conducted multiple criminal trials. Counsel said that the State made the Petitioner an offer to plead guilty, but the Petitioner rejected the offer, maintaining his innocence throughout the duration of Counsel's representation.

Counsel recalled seeing the State's list of witnesses before trial. He could not recall whether Mr. White was listed as a potential witness but, he said, he had more than a month's notice that Mr. White was going to be a witness. Counsel said that he told the Petitioner about Mr. White as soon as Counsel learned that Mr. White would testify, and the Petitioner had to "be moved to Crockett County . . . because of that." Counsel said that, as far as investigating Mr. White, he obtained copies of Mr. White's prior convictions. He did not recall interviewing Mr. White.

Counsel said that he did not specifically recall the Petitioner saying that he wanted to testify. He said that the two discussed the matter and that the Petitioner's prior convictions, including multiple robbery convictions, could be used to impeach him. Counsel said he did not recall questioning the Petitioner on the record about his desire to testify, but he said that if the Petitioner had wanted to testify that Counsel would have ensured that he got the opportunity to do so.

Counsel said that Ms. Cohen approached him at some point and said that she loved the Petitioner. The Petitioner showed him some letters from Ms. Cohen, but he was "very guarded about those correspondences." Counsel said that, had there been statements in the letters that would have assisted the Petitioner, Counsel would have attempted to present the letters at trial. Counsel did not recall receiving a copy of the letters, but he agreed that the Petitioner showed him at least one letter during a meeting between the two men. He identified a letter at the post-conviction hearing, but said he did not recall ever seeing this specific letter, but did recall reading a letter that referenced the Petitioner and Ms. Cohen as the "Dutch and Duchess," which this letter did. The letter's author stated that "it just eat me up about all this," and that she did this because

---

[1] Counsel's testimony was given on two separate occasions. The post-conviction court continued the hearing to give Counsel more time to review his file. For brevity, our summary of the facts here summarizes the facts elicited on direct and cross during both of the hearings.

"you wasn't coming back home and I didn't want you with nobody else." Counsel said he did not have a specific recollection of this letter, he never found a copy of this letter in his file, and he did not use this letter to impeach Ms. Cohen.

Counsel identified a letter ("Letter Exhibit 1") that he did recall seeing before trial. He said that the letter opened the door to the Petitioner's relationships with other women, which he thought might be damaging. He agreed that it referenced Ms. Cohen's actions being based on anger toward the Petitioner, which was potentially helpful, but he decided the better legal tactic was to impeach Ms. Cohen with her prior convictions.

Counsel said that the Petitioner filed a complaint against him with the Board of Professional Responsibility. He did not recall the Board taking any action against him.

During cross-examination, Counsel testified that he did not see any grounds to disqualify Mr. White as a witness. At trial, Mr. White testified that the Petitioner had told Mr. White that he had been standing outside the Cash Express on his cell phone the morning it got robbed. Counsel said that his advice to the Petitioner had been not to talk to anyone about his case and that the Petitioner clearly did not follow that advice.

He further stated that he did not think the letters from Ms. Cohen would have assisted the Petitioner because they were "love letters," so there was not information regarding the charges. Counsel said that Letter Exhibit 1 also referenced another case that the Petitioner faced in Chester County, and the letter's author indicated that she lied or provided the Petitioner with a false alibi. He said he would have thought "long and hard" about whether to introduce that letter because the jury would hear that the Petitioner had other charges pending against him and because Ms. Cohen had previously lied to help the Petitioner.

Counsel testified he did not recall the Petitioner ever saying that he wanted to testify, and he did not recall the Petitioner saying what his testimony would be. Counsel did not recall any discussion regarding facilitation as a lesser-included offense.

Counsel said that he went over with the Petitioner the State's plea offer. He said that the two discussed the pros and cons of pleading guilty and that the Petitioner made an informed decision when he declined the State's offer.

Based upon this evidence, the post-conviction court denied the Petitioner's petition. The post-conviction court stated:

> The court does find that the Petition is not well founded.

Most of the allegations are totally without merit.

I do want to address a couple of things, though, with regard to effective assistance of counsel.

I found the latter testimony of Mr. White to be non-believable. I'm not even sure . . . that he actually changed his testimony, but whether he did or not, he was unbelievable at the time he did.

I found [Counsel's] reasons for not using the letter, if you will, certainly plausible, if not prudent. I did not see anything in the record to indicate that [Counsel] was ineffective in anyway.

I am concerned, as we all are now, about the fact that a hearing on the record wasn't held regarding the [Petitioner's] election to choose not to testify. I think the totality of the evidence indicates that he was aware of his right to testify. I also think that when you weigh the factors that the State has pointed out, the overall strength of this case was extremely strong. The decision not to testify was probably, frankly, in terms of evaluating the proof and what he indicated he would have done had he testified – his decision not to testify was probably the best one he made during the entire process. It's almost impossible to see that it could have altered the state of the proof in any way positive to the [Petitioner] or made any difference in the verdict, so that's my decision.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition for post-conviction relief because his trial counsel was ineffective for: (1) failing to interview Mr. White before trial; (2) failing to adequately cross-examine Ms. Cohen; (3) failing to allow him to testify; and (4) failing to have the jury instructed on facilitation. The State counters that the Petitioner failed to establish his claim of ineffectiveness with adequate proof.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C. A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate

11

the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*,

753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

### A. Interview of Mr. White

The Petitioner first contends that Counsel was ineffective for failing to interview Mr. White before trial. He asserts that, had Counsel interviewed Mr. White, he would have learned that Mr. White was not being truthful when he said he had "not really" reviewed the Petitioner's discovery. The State counters that the post-conviction court did not find Mr. White credible in his post-conviction court testimony, which is dispositive of this issue. We agree with the State.

The post-conviction court found, first, that Mr. White's testimony at the post-conviction hearing did not vastly differ from his trial testimony. At the trial, Mr. White said he had "not really" reviewed the discovery. At the post-conviction hearing, Mr. White said that he had, in fact, reviewed discovery, so he was unsure whether his testimony came from facts he read in the discovery or facts that the Petitioner told him.

13

The post-conviction court found that Mr. White's testimony at the post-conviction hearing was not believable.

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *Nichols v. State*, 90 S.W.3d 576, 586 (Tenn. 2002). In this case, the evidence does not preponderate against the post-conviction court's finding that Mr. White was not credible during his post-conviction hearing testimony. As the State notes in its brief, Mr. White did not admit during the post-conviction hearing that his trial testimony was "false" and instead he said that he did not "feel comfortable" with his trial testimony. He said that he "believed" that he saw the discovery and that he was "unsure" whether his trial testimony was based on discovery or what the Petitioner had told him. We defer to the post-conviction court's credibility determination. As such, Mr. White's trial testimony is not called into question, and Counsel was not ineffective for not interviewing Mr. White before trial. The Petitioner is not entitled to relief as to this issue.

### B. Cross-Examination of Ms. Cohen

The Petitioner contends that Counsel was ineffective for not adequately cross-examining Ms. Cohen. He asserts that he gave to Counsel letters that Counsel did not use during cross examination. The State counters that, as the post-conviction court found, Counsel's reasons for not using the letters were "plausible if not prudent."

After review of the letter, we conclude that the post-conviction court did not err when it found that Counsel's decision not to introduce the letter was not ineffective. The letter contains the statement that "I did say what I said cause I was pissed. Very pissed!! You told me you had a girlfriend. You were done with me." The letter does not state that Ms. Cohen lied when she spoke with police, but only that she spoke with them because she was angry. While cross-examination with this statement may have aided the Petitioner slightly, the letter also contained multiple damning statements. First, it states, "They tried to pin the Chester County shit on you . . . ," which potentially opens the door to other offenses the Petitioner had committed. Further, the letter states "You want the truth about who I been fuc***g? I ran into my brother old classmate . . . . [H]e said you smoked dope and you were passed out at somebody house in a closet full of dirty clothes . . . ." Ms. Cohen then goes on to say in the letter that she broke up with this man because he was a "dope head[]." The letter contains explicit language regarding other sexual exploits, including her desire for more of those with the Petitioner. Ms. Cohen discusses in the letter their mutual friends, and how one of them has a child by an older man who had served twenty-three years in jail but was still "stealing shit" by stealing from his employer daily. She then says "HaHa" with regard to the man giving stolen property to their mutual friend. Ms. Cohen discussed that she was "on the run again,"

14

having warrants for violating her probation. Ms. Cohen closed the letter by discussing the legal troubles of several other mutual friends. She then wrote that she loved the Petitioner and that she would never do anything to hurt him. She wrote, "AGAINST YOU NEVER."

The letter does not clearly state that Ms. Cohen lied to police. The tone and tenor of the letter is one of someone who loves the Petitioner and wants him to be released from prison. Her trial testimony included that the Petitioner admitted to committing this offense. Had Counsel introduced this letter, and had Ms. Cohen stood by her testimony, the letter could have harmed the Petitioner more than it might have helped him. The letter does not contradict Ms. Cohen's testimony that the Petitioner admitted committing this crime. Further, the letter discusses other charges against the Petitioner, his drug use, and the illegal activities of their friends and acquaintances. We agree that Counsel's decision not to introduce this letter was not ineffective, in part because as part of his trial strategy, he considered the letter and deemed that it would not be beneficial. The Petitioner is not entitled to relief on this issue.

### C. Right to Testify

Recognizing that a hearing in accordance with *Momon* was not held in his case, the Petitioner argues that he did not waive his right to testify and has asked this Court to review the issue as proof of ineffective assistance of counsel. The State counters that Counsel ensured that the Petitioner understood his right to testify and that the Petitioner waived that right. The State further contends that the Petitioner cannot show he was prejudiced, considering the weight of the evidence.

In *Momon*, our supreme court determined that the trial court is required to have defense attorneys conduct a hearing, out of the presence of the jury, to "voir dire" the defendant about whether he or she had made a knowing, voluntary, and intelligent waiver of the right to testify. *Momon*, 18 S.W.3d at 162. However, our supreme court expressly stated:

> The procedures are prophylactic measures which are not themselves constitutionally required. As such, the procedures adopted herein do not establish a new constitutional rule which must be retroactively applied . . . . [T]he mere failure to follow these guidelines will not in and of itself support a claim for deprivation of the constitutional right to testify if there is evidence in the record to establish that the right was otherwise personally waived by the defendant.

*Id*. at 163. While this Court has stated in *State v. Posey*, 99 S.W.3d 141, 149 (Tenn.

Crim. App. 2002) that "[t]he waiver of a defendant's right to testify on his own behalf will not be presumed from a silent record," the record in this present case was not "void of any evidence" that the defendant personally waived his right to testify. *Id*. at 143.

The record in the present case contains evidence that the Petitioner waived the right. Counsel testified that he ensured that the Petitioner understood the pros and cons of testifying and that the Petitioner made an informed decision not to testify. Thus, the failure to conduct a *Momon* hearing in this case is mere procedural error that does not "in and of itself support a claim for deprivation of the constitutional right to testify." *Momon*, 18 S.W.3d at 163.

Further, as a ground for ineffective assistance of counsel, even if Counsel's failure to follow the prescribed regimen in *Momon* equated to deficient performance, the Petitioner must still show a reasonable probability that the oversight prejudiced the outcome of his trial. *See Strickland*, 466 U.S. at 694. In *Posey*, this court turned to a harmless error test that considered: (1) the importance of the defendant's testimony; (2) the cumulative nature of the testimony; (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; and (4) the overall strength of the prosecution's case. *Id*. at 149.

In the present case, the Petitioner said that, had he testified, he would have said he did not commit this armed robbery. He said he would have offered the letters from Ms. Cohen, and he would have said that Mr. White was a hostile witness. Had the Petitioner testified, he would have been subject to cross-examination regarding his DNA on the cell phone left at the crime scene by the robber and his multiple prior felony convictions for aggravated robbery. Given the weight of the State's evidence, we conclude that the post-conviction court did not err when it found that the failure to hold a *Momon* hearing was harmless error to the outcome of the trial. We cannot conclude that the error prejudiced the outcome of the trial as to show ineffective assistance of counsel. The Petitioner is not entitled to relief on this issue.

### D. Facilitation Instruction

Finally, the Petitioner contends that Counsel was ineffective "in that he failed to require the court to instruct the jury [on the] lesser included offense" to aggravated robbery. The State surmises that the Petitioner is maintaining his argument below that Counsel was ineffective for failing to obtain a jury instruction for facilitation of aggravated robbery as a lesser-included offense. It then posits that the evidence did not support such an instruction.

Ms. Cohen testified at trial that the Petitioner told her that he committed this

16

aggravated robbery and that there was a female Cash Express employee and boyfriend who were also involved. Ms. Cohen testified that the Petitioner never said anything about whether the female employee's boyfriend actually participated in the robbery, but she said that the woman had gotten scared and left the store prior to the robbery.

Under Tennessee law, "[r]obbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2014). As charged in this case, aggravated robbery is a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-402(a)(1)-(2) (2014). For facilitation of aggravated robbery, the defendant must have known the other person intended to commit the robbery; and, without intent to promote or assist in the commission of the robbery or benefit in the proceeds, "knowingly furnish[ ] substantial assistance in the commission" of the robbery. T.C.A. § 39-11-403(a) (2014).

In the present case, there is no evidence that someone else committed this robbery and that the Petitioner knew that they intended to commit the robbery and gave them substantial assistance. The State offered evidence that the Petitioner committed the robbery, which included DNA evidence and his admissions to two separate witnesses, and the Petitioner argued that the State had not met its burden of proof. The evidence presented by the parties did not warrant a jury instruction of facilitation. Further, the Petitioner testified that Counsel requested, but did not receive, this instruction. He has failed to identify what more Counsel could have done to "require" the trial court to instruct the jury on facilitation. As such, the post-conviction court did not err when it found that Counsel was not ineffective in this regard. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

17